UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| RUBEN AGUILAR, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:13-CV-17 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION**

Plaintiff Ruben Aguilar brought this action on January 22, 2013, seeking review of the Commissioner's final decision that he was not disabled prior to May 14, 2009. (D.E. 1). On March 2, 2014, Plaintiff filed a motion for summary judgment. (D.E. 11). On March 21, 2014, Defendant filed a response. (D.E. 12). For the reasons that follow, it is respectfully recommended that Plaintiff's motion for summary judgment be **DENIED**, the Commissioner's determination that Plaintiff was not disabled prior to May 14, 2009, be **AFFIRMED**, and Plaintiff's cause of action be **DISMISSED**.

**I. JURISDICTION**

The Court has jurisdiction over the subject matter and the parties pursuant to 42 U.S.C. § 405(g).

**II. BACKGROUND**

Plaintiff filed his first application for Supplemental Security Income ("SSI") benefits on June 26, 2007, at the age of 47. (D.E. 5-8). Plaintiff alleged disability as of

July 1, 2004,[1] due to a deteriorating hip, limited to no vision in his right eye due to a cataract, arthritis in his knees and fingers, severe sleep apnea requiring the use of a c-pap machine, an inability to sit or stand for lengths of time, sleeplessness due to back and hip pain, and limited mobility requiring the use of cane or a walker. (D.E. 5-8, Page 7). Plaintiff indicated he stopped working on November 25, 2003, because he was incarcerated, not because of his ailments, and that his ailments prevented him from working beginning July 1, 2004. (D.E. 5-8, Page 7). Plaintiff's application was denied upon initial determination, and again upon reconsideration. On November 1, 2010, Plaintiff filed his first federal action in this matter. Case No. 2:10-CV-349. On July 28, 2011, this Court issued a Memorandum and Recommendation ("M and R") and Order directing the case be remanded to the ALJ for further proceedings, finding the ALJ unreasonably evaluated Plaintiff's credibility regarding his self-reported limitations and as such, the ALJ erred when determining Plaintiff's residual functional capacity ("RFC"), thus making a new hypothetical question necessary. Case No. 2:10-CV-349, D.E. 18, Page 36 and D.E. 19. Specifically, this Court found the ALJ improperly discounted Plaintiff's credibility by asserting Plaintiff was able to perform certain daily activities without assistance, which was contrary to Plaintiff's testimony and Plaintiff's social security forms and records. (D.E. 18, Page 25).

---

[1] Plaintiff is currently receiving benefits as the result of a second SSI application. At issue is the onset date of disability. Plaintiff is seeking benefits for the period of June 26, 2007, the protective filing date of his first application through May 14, 2009, the date he was determined to be disabled and awarded benefits as a result of his second application.

During the appeals process of Plaintiff's first application, Plaintiff filed a second application.  This second application was approved with a disability onset date of May 14, 2009.  (D.E. 11, Page 2).  However, at issue in the pending case is whether Plaintiff is entitled to disability beginning June 26, 2007, the date he protectively filed his first application, through May 13, 2009.

### III.  MEDICAL EVIDENCE

Plaintiff's medical history for the period at issue in this case was summarized in a previous ruling by this Court and therefore it need not be repeated here at length.  Case No. 2:10-CV-349, D.E. 18.  The entire record has been reviewed and considered and is, in relevant portion, discussed below.

### IV.  ADDITIONAL HEARING TESTIMONY

Plaintiff, represented by counsel, attended a hearing on April 23, 2012.  Plaintiff testified, as did expert witnesses Arthur Briggs, M.D., Sharon Rogers, Ph.D., and Donna Johnson, a vocational expert ("VE").  (D.E. 5-12, Pages 1-68).  The ALJ limited testimony to whether Plaintiff was disabled prior to May 14, 2009.  (D.E. 5-12, Page 29).

Dr. Briggs, having reviewed Plaintiff's medical records, opined that Plaintiff did not meet or equal any of the listings of the Commissioner prior to May 14, 2009.  (D.E. 5-12, Pages 31-32).  Dr. Briggs testified that Plaintiff had avascular necrosis of the left hip and a partial collapse of the left femoral head on October 27, 2009, which later necessitated a hip replacement on April 5, 2010. (D.E. 5-12, Page 32).  He testified that when a hip collapses, it does so suddenly, and would be causing pain prior to the collapse.  (D.E. 5-12, Page 38).  However, Dr. Briggs stated that Plaintiff's hip ailments

and resulting pain would not have prevented Plaintiff from performing sedentary work during the time at issue.  (D.E. 5-12, Pages 38-39).

Dr. Briggs further testified that an October 3, 2007, MRI showed "only mild degenerative changes" in Plaintiff's back and left knee.  (D.E. 5-12, Page 32).  Dr. Briggs also stated that on February 20, 2007, Plaintiff had a cataract causing vision problems that was corrected to 20/20 and 20/25 visual acuity by August 19, 2008, after cataract surgery.  (D.E. 5-12, Page 32).  He additionally stated that Plaintiff had "some obstructive sleep apnea—was on CPAP.  Difficult to evaluate exactly what that was all about" and considering all ailments, Plaintiff was able to do sedentary work prior to May 14, 2009.  (D.E. 5-12, Page 33).  Dr. Briggs opined that Plaintiff, using a cane at all times, could lift and carry up to 10 pounds, could stand two hours and sit six hours in an eight hour day, could not climb ladders, ropes or scaffolds or work at unprotected heights or with dangerous moving machinery and could not work in extreme cold or humidity.  (D.E. 5-12, Pages 33-35).  He testified that Plaintiff could effectively ambulate, using a cane, over rough terrain and up and down on streets and curbs for two hours out of an eight hour day if it was "spread out."  (D.E. 5-12, Page 35).

Dr. Rogers, having reviewed Plaintiff's medical records, opined that Plaintiff did not meet or equal any of the listings of the Commissioner prior to May 14, 2009.  (D.E. 5-12, Page 41).  Dr. Rogers stated Plaintiff "admits he's an alcoholic" who, on average as of May 2009, drank an average of six to 12 packs [of beer] per day."  (D.E. 5-12, Page 43).  Dr. Rogers further stated that Plaintiff twice refused entrance into a substance abuse program due to financial concerns and that he was diagnosed with an adjustment disorder

with depressed mood with a global assessment of functioning ("GAF") at 62.  (D.E. 5-12, Pages 42-44).

Dr. Rogers stated that the only other consultative examination was performed in February 2008 where Plaintiff reported that it was mainly his physical ailments, rather than any mental impairments including depression, that prevented him from working. (D.E. 5-12, Page 44).  Dr. Rogers further stated that there was no history of counseling or psychiatric hospitalization, Plaintiff was not taking any medication for depression although he had been prescribed Lexapro, and Plaintiff socialized with friends and family, including his wife and children.  (D.E. 5-12, Pages 45-46).  Dr. Rogers stated Plaintiff's IQ is "estimated to be within the average range of functioning" with a "mild deficit in remote memory—just the difficulty they mentioned about specific details and dates."  (D.E. 5-12, Pages 46-47).  Dr. Rogers stated Plaintiff was diagnosed with major depressive disorder, a GAF of 60, and a "fair" prognosis provided that Plaintiff take an antidepressant and receive therapy.  (D.E. 5-12, Page 47).

Dr. Rogers opined that, giving credit to the level of ongoing discomfort Plaintiff described, Plaintiff had mild deficiencies with daily living activities and social functioning, moderate deficiencies in attention, concentration and pace, and that Plaintiff could understand, remember, carry out and make decisions, attend and deal with workplace peers, bosses, and occasional routine work changes from a non-exertional perspective throughout an eight-hour day with normal breaks.  (D.E. 5-12, Page 48).[2]

---

[2] Plaintiff's counsel did not examine Dr. Rogers when provided an opportunity to do so.  (D.E. 5-12, page 49).  Plaintiff's counsel did examine Dr. Briggs.  (D.E. 5-12, Pages 34-41).

Plaintiff testified that during the time period at issue he was having problems with his back, hip, and knees and was in constant pain. (D.E. 5-12, Page 50). Plaintiff stated he began having hip problems in 2003 and while he was able to get up sometimes without a cane, he began using a cane 90 percent of the time beginning in 2006.[3] (D.E. 5-12, Pages 51 and 66). Plaintiff further testified that he was unable to walk half a block for exercise in 2007 and 2008 because it caused pain to walk on uneven sidewalks. (D.E. 5-12, Page 53). Plaintiff stated that while he currently always had a companion with him, he did not have a companion from 2007 through 2009. (D.E. 5-12, Page 54). Plaintiff also stated he would "always try to get a friend to go with me" when he was walking because he was afraid he would fall and his friends and family cut his yard, took care of his dogs and cleaned his house.  (D.E. 5-12, Page 54). He stated that while he owned a car, his friend had to drive him to the grocery store because he could not manage the clutch and he used public transportation with the assistance of a companion or friend. (D.E. 5-12, Page 58). Plaintiff further stated he was able to walk up stairs slowly with a cane and holding onto a railing. (D.E. 5-12, page 59).

He reported having difficulty sleeping because of concern over financial matters. (D.E. 5-12, Page 55). Plaintiff further reported he had pain while sitting, standing, walking and lying down and had to rotate through the positions to seek relief and he was unable to sit for two hours at a time. (D.E. 5-12, Page 56). He stated he had "slight" memory and concentration problems because of pain, had issues with depression because

---

[3] Plaintiff stated he received a walker and a wheel chair after his hip replacement in 2010, after the time period currently at issue. (D.E. 5-12, Page 52).

he was unable to work, and needed a CPAP machine because of severe sleep apnea. (D.E. 5-12, Pages 57 and 59).

The ALJ posed a hypothetical question to Ms. Johnson, the VE, asking her to consider a person of the claimant's age, education and work experience. The person could lift and carry 10 pounds frequently, could not work in extreme cold or humidity, could stand and walk with a cane two hours of an eight-hour day and sit at least six hours, could not climb ladders, ropes or scaffolds, and could not work in unprotected heights around moving machinery. The person is capable of detailed uninvolved work, able to make decisions, attend, deal appropriately with workplace peers, bosses, and occasional routine work changes throughout the day with normal breaks. (D.E. 5-12, Pages 61-65). The VE testified that such a person could not perform Plaintiff's previous work, but could work as a wood parts inspector, addressor, or information clerk, all of which are sedentary positions. (D.E. 5-12, Page 62). A person would be able to sit or stand as needed but would not be able to sit, stand, walk too far, or lay down as needed. (D.E. 5-12, Pages 65-66). Finally, the VE testified that if a person could not maintain work activity for eight hours a day, five days per week on a continuous, sustained basis, there would not be any jobs he could do. (D.E. 5-12, Page 64).

## V.  STANDARD OF LAW

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards. *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*; *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The burden has been described as more than a scintilla, but lower than a preponderance. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). A finding of "no substantial evidence" occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988) (citations omitted).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present. But the Court does not reweigh the evidence, try the issues de novo or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citations omitted). It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors: (1) objective medical evidence or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and others who have observed him and (4) the claimant's age, education and work history. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citations omitted).

In evaluating a disability claim, the Commissioner follows a five-step process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work. *Martinez v. Chater*, 64 F.3d 172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520. The claimant bears the burden of proof on the first

four steps with the burden shifting to the Commissioner at the fifth step. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

Disability onset dates are governed by Social Security Ruling 83-20 ("SSR 83-20").   "Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence." *Spellman v. Shalala*, 1 F.3d 357, 361 (5th Cir. 1993).  These three factors are often analyzed together.  However, while the date the disability caused the claimant to stop working is often a very significant factor, medical evidence is the primary element in the determination of the onset of disability. *Id*.  "The claimant's stated onset date is used as the established onset date when it is consistent with available evidence." *Id.* (citations omitted).  "SSR 83-20 recognizes that with slowly progressive impairments, including mental impairments, 'it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling.'" *Id; see also* SSR 83-20.

Accordingly:

"In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.  Particularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e., be decided on medical grounds alone) before onset can be established.

In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working.  How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case.  This judgment, however, must have a legitimate medical basis.  At the hearing, the ALJ should call on the services of a medical advisor when onset must be inferred.  If there is information indicating that additional medical evidence is available, such evidence should be secured before inferences are made.

If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional medical evidence is not available, it may be necessary to explore other sources of documentation. *Spellman*, 1 F.3d 357 at 361.

## VI.  DISCUSSION

### A.  ALJ's Determination

In the ALJ's May 31, 2012, decision, the ALJ followed the five-step sequential process determining that at step one, the Plaintiff had not engaged in substantial gainful activity since his application date of June 26, 2007.  (D.E. 5-12, Pages 12-21).  At step two, the ALJ found that Plaintiff's severe impairments included degenerative joint disease of the left hip, degenerative disc disease of the lumbar spine, diabetes mellitus, right eye diabetic cataract status post-surgical repair, obstructive sleep apnea, obesity, alcohol dependence, and major depressive disorder. At step three, the ALJ found that Plaintiff's severe impairments did not meet or equal the requirements of any listed impairment for presumptive disability.  In deciding step three, the ALJ relied upon the testimony of Dr. Briggs and Dr. Rogers who testified that Plaintiff's impairments or combination of impairments did not meet or medically equal any listing during the relevant period as well as Plaintiff's medical records and testimony.  At step four, relying on Plaintiff's testimony, Dr. Brigg's and Dr. Roger's testimony, and Plaintiff's medical records, the ALJ found that Plaintiff could not perform his past relevant work.  At step five, the VE testified there were a number of jobs Plaintiff could perform in the national economy, including inspector of wooden parts, addresser, and information clerk. As a result, the ALJ concluded that Plaintiff was not disabled at any time from June 26, 2007

to May 13, 2009. (D.E. 5-12, Pages 12-21).  The ALJ determined that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's allegations regarding the intensity, persistence and limiting effects of these symptoms were not credible and Plaintiff, during the time at issue, retained the RFC to perform work at a sedentary level.  (D.E. 5-12, Page 6).

### B.  Issues Presented

Plaintiff contends the ALJ's decision is not supported by substantial evidence. Specifically, Plaintiff claims the ALJ erred by:  (1) failing to find Plaintiff met or equaled a listing or combination of listings; (2) failing to give controlling weight to the opinions of Plaintiff's treating physicians; (3) failing to properly consider Plaintiff's subjective complaints and improperly discounting Plaintiff's credibility; and (4) failing to properly develop the case.  In sum, Plaintiff is challenging the determination that May 14, 2009 is the onset of his disability.

#### 1.  Listing or Combination of Listings and Opinions of Plaintiff's Treating Physicians

The ALJ considered the possible relevant listings, including 1.02.  According to this listing, the inability to ambulate effectively requires extreme limitation of the ability to walk and is defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of hand-held assistive devices that limit the functioning of both upper extremities.  Examples of ineffective ambulation include the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use

standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  20 C.R.F. Pt. 404, Subpt. P, App. 1 (B)(2)(b)(2).

In his January 15, 2008 disability questionnaire, Plaintiff indicated he was able to care for his personal needs, feed his dogs every morning, and prepare small meals when not in pain.  (D.E. 5-8, Page 44).  Plaintiff further stated his family or friends will sometimes cook for him when he is unable to get out of bed.  (D.E. 5-8, Page 44). Plaintiff also indicated he was able to do some laundry and he was able to drive only during the day due to poor vision.  (D.E. 5-8, Pages 45 and 49).  Plaintiff stated his friends would take him to grocery shop or he would give his friends a list to shop for him. (D.E. 5-8, Page 44).  Plaintiff reported he was sometimes unable to move or take care of himself due to lower back pain, knee pain, left hip pain, arthritis in his fingers and ankles and headaches.  (D.E. 5-8, Page 48).   Additionally, Plaintiff reported he was able to walk short distances for exercise but could not kneel or squat.  (D.E. 5-8, Page 49).

Plaintiff testified at the April 23, 2012 hearing that he was unable to walk half a block for exercise in 2007 and 2008 because it caused pain to walk on uneven sidewalks, his friends and family cut his yard, took care of his dogs, cleaned his house, and took him to the grocery store because he could not manage the clutch on his car or drive at all and that he used public transportation with the assistance of a companion or friend.  (D.E. 5-12, Page 54-58).  Plaintiff further testified he was able to walk up stairs slowly with a cane and/or holding onto a railing.  (D.E. 5-12, page 59).  Plaintiff stated that while he currently always had a companion with him, he did not have a companion in 2007

through 2009. (D.E. 5-12, Page 54). Plaintiff also testified that he began using a cane 90 percent of the time in 2006 and received a walker and a wheel chair after his hip replacement in 2010, after the time period currently at issue. (D.E. 5-12, Page 51). Plaintiff's testimony and medical evidence that he required the use of a single cane to walk would not qualify him for disability. *Bullock v. Astrue*, 277 F. App'x 325, 328 (5th Cir. 2007) ("Bullock would also have to show that she is unable to ambulate effectively as described in Listing 1.00(B)(2)(b), which is also not supported by the record. The record indicates that Bullock is able to walk with the help of a single cane, not a walker, two crutches or two canes.").

Plaintiff now asserts he was using a walker during the time period in question, despite having testified at the April 2012 hearing that he did not own or use a walker until after his hip replacement surgery in 2010, after the time period currently at issue. (D.E. 5-12, Page 52). Upon review of the record, Plaintiff testified at the December 2008 hearing that he used a cane each day and "[a] lot of time, I have to use my walker." (D.E. 5-4, Page 29). However, the Plaintiff fails to direct the Court to any objective evidence to resolve Plaintiff's inconsistent testimony as to when he actually began using a walker or how often he used it.

As previously noted by Plaintiff, numerous medical personnel noted Plaintiff required, and Plaintiff reported that he required, the use of a cane to walk. (D.E. 15, Page 15 and D.E. 18, Page 27). However, Plaintiff cites to only one treating medical professional who noted in May 2007 that Plaintiff "needs a walker at times." (D.E. 5-10, Page 16). When reviewing this medical record and an additional record from June 26,

2007, the treating medical professional is reporting Plaintiff's subjective complaints and statements.  It does not appear the treating medical professional ever observed Plaintiff using a walker.  (D.E. 5-10, Pages 15 and 16); *Greenspan v. Shalala*, 38 F.3d 232, 237-38 (5th Cir. 1994)(A physician's recording of symptoms is not entitled to great weight when the documentation is by history rather than by direct observation).  Therefore, while Plaintiff arguably owned and may have intermittently used a walker during the time at issue, based solely on Plaintiff's testimony, he used his cane 90% of the time and was able to get up without one at times.  (D.E. 5-12, Page 51).  Further, there are no treatment records indicating Plaintiff was unable to walk, with the assistance of a cane, during the relevant time period.  Lastly, there are no objective records to support Plaintiff's assertion that he used a walker during the relevant time period.

The ALJ considered the Plaintiff's reported daily activities including, contrary to Plaintiff's assertions, that Plaintiff testified he received assistance in his activities and errands from friends and family.  (D.E. 5-12, Page 16).  The ALJ specifically noted "[t]he claimant testified that, during the relevant period, he received assistance in his activities and errands from friends and relatives."  (D.E. 5-12, Page 16).  Further, the ALJ thoroughly reviewed Plaintiff's treatment records as well as the opinions of Dr. Briggs and Dr. Rogers.  Specifically, the ALJ noted that Plaintiff's October 2007 MRI showed mild degenerative dessication within the intervertebral discs at L4-L5 and L5-S1 with no neural foraminal narrowing or spinal canal stenosis or disc protrusion or any findings suggestive of a high likelihood for a cause of apparent left lower extremity radiculopathy. (D.E. 5-12, Page 18; D.E. 5-20, Page 66).  Further, the ALJ noted that while Plaintiff had

been diagnosed with avascular necrosis of the left hip, Plaintiff's February 2009 treatment notes state Plaintiff was not a candidate for total hip arthroplasty.  (D.E. 5-12, Page 18; D.E. 5-20, Page 4).  The ALJ further referred to Dr. Briggs testimony, stating that while claimant likely experienced pain in the period before his condition required surgery, it would not prevent him from working, limiting him to sedentary work.  (D.E. 5-12, Page 18).   The ALJ noted that Plaintiff reported using a cane to walk since 2007 and his records show he subsequently underwent left total hip arthroplasty on April 15, 2010, after the relevant period.  (D.E. 5-12, page 18).

Plaintiff's June 14, 2007, treatment note indicates "left hip avascular necrosis" and "sizeable left hip joint effusion."  (D.E. 5-10, Page 44).  Additionally, Plaintiff's August 1, 2008, treatment record identifies a "mild left hip arthritic change."  (D.E. 5-11, Page 17).  It further states:  "Increased density is suspected involving the left femoral head. There may be some minimal flattening of the left femoral head.  Right hip appears relatively well maintained."  (D.E. 5-11, Page 17).  The ultimate conclusion in August 2008 was "early avascular necrosis."  (D.E. 5-11, Page 17).  Plaintiff's September 24, 2008 treatment record states:  "There is…suggestion of a chronic fracture or heterotopic bone associated with previous injury on the inferior rim of the acetabulum.  Changes seen about the [left] hip joint suggesting degenerative joint disease."  (D.E. 5-11, Page 15).

After the relevant time period currently at issue, the ALJ noted that Plaintiff's October 27, 2009, treatment notes state:  "There is avascular necrosis of the left femoral head which is partially collapsed.  It appears long-standing as there is secondary osteoarthritic of the left hip joint…There are fairly extensive arteriosclerotic vascular

calcifications present." (D.E. 5-11, Page 25). Further, Plaintiff's left knee indicated no "significant or joint abnormality…[t]here is a slight narrowing of the femoral patellar joint." (D.E. 5-11, Page 24). Additionally, Plaintiff's back indicated only "mild multilevel degenerative disc disease" with "mild degenerative changes." (D.E. 5-11, Page 23-24).

Dr. Briggs testified that when a hip collapses, it does so suddenly, and would be causing pain prior to the collapse. (D.E. 5-12, Page 38). Plaintiff's medical records indicate the degenerative nature of Plaintiff's hip ailment, supporting Dr. Briggs conclusion, which was relied upon by the ALJ, that the October 27, 2009, scan revealing the partial collapse of Plaintiff's left hip was the point at which Plaintiff's condition became severe, rendering him disabled. (D.E. 5-12 at 397; D.E. 5-20, Pages 80-82).

In cases of slowly progressive impairments, such as the Plaintiff's impairment, the ALJ "should call on the services of a medical advisor when onset date must be inferred" to make an informed judgment on the facts in a particular case. *Spellman*, 1 F.3d at 361. In this case, the ALJ thoroughly reviewed Plaintiff's testimony, his medical records, the opinions of consultative doctors and a VE. Plaintiff's established onset date of May 14, 2009, five months before the October 27, 2009 scan which revealed a partial collapse of Plaintiff's left hip takes into account the degenerative nature of his ailment. However, as discussed above, substantial evidence supports the ALJ's decision that Plaintiff's hip ailments and resulting pain would not have prevented Plaintiff from performing sedentary work from June 16, 2007 through May 14, 2009. (D.E. 5-12, Pages 38-39).

Plaintiff further contends the ALJ did not consider a combination of impairments that might meet or equal a listing, focusing on Plaintiff's sleep apnea, COPD, and depression.[4]   However, Plaintiff fails to identify which listing, other than 1.02 as discussed above, Plaintiff alleges his ailments meet or equal.  Instead, Plaintiff asserts the ALJ improperly gave more weight to the opinion of a non-treating medical expert, ignoring those of Plaintiff's treating physicians.  To the contrary, as noted above, the ALJ reviewed Plaintiff's medical records, citing the records of his treating physicians.  (D.E. 5-12, Page 19).

Under the regulations, the ALJ is supposed to give more weight to the opinions from treating sources because they are more likely to be the medical professionals most able to provide a detailed, longitudinal picture of Plaintiff's impairments and might bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  20 C.F.R. § 404.1527(d).  The ALJ can decrease reliance on treating physician testimony for good cause, which includes statements which are brief or conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques or otherwise unsupported by evidence.  *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995)(citations omitted).  However, the ALJ must perform a detailed analysis of the treating physician's view under the criteria set for in 20 C.F.R. §

---

[4] In order to qualify for benefits by showing that an unlisted impairment, or combination of impairments, is equivalent to a listed impairment, a plaintiff has the burden to present medical findings that his impairment or combination of impairments equals in severity to all the criteria for the one most similar impairment.  *Washington v. Barnhart*, 424 F.Supp.2d 939, 951 (S.D. Tex. 2006)(*citing Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) and 20 C.F.R. § 416.926(a)).

404.1527(d) before rejecting the opinion of a treating physician. *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

In his pending complaint, Plaintiff states that the "medical expert's opinion is flawed as it is based on inaccurate facts." Plaintiff states treating physicians documented Aguilar's physical limits: "can't work w/ L hip pain, also c/o [complained] L hip pain, L hip, knee & back pain is not getting better, L hip pain is severe—has to walk with cane, L hip pain [increased], can't walk can't sleep wants stronger pain med, L hip pain Xs 2-3 yrs MRI – poss avascular necrosis, pt [patient] has [decreased] ROM [range of motion] L hip." (D.E. 11 at 7). However, the majority of the recordings are Plaintiff's subjective complaints to his doctors rather than the opinions of his treating physicians. Further, the records cited from Plaintiff's radiologist diagnosis and monitor Plaintiff's avascular necrosis but do not opine as to any resulting physical limitations. Further, while Plaintiff argues the ALJ gave improper weight to the Dr. Briggs and Dr. Roger's testimony, he fails to identify which treating physicians' opinions the ALJ improperly dismissed. (D.E. 11, Pages 20-21). No medical report contained in the record reflects a physician's conclusion that Plaintiff was unable to work.

In addition to records previously discussed related to Plaintiff's hip, back and knee ailments, the ALJ further noted that while Plaintiff's August 2008 records indicated his corrected visual acuity after his July 14, 2008 cataract surgery was 20/20(right) and 20/25(left) and his January 2008 records demonstrated that Plaintiff slept better with the prescribed CPAP machine. (D.E. 5-12, Page 18). The ALJ considered that Plaintiff complained of depression in January 2008, was prescribed Lexapro and then self-

discontinued the medication due to reported side effects of headaches despite his primary care physician's advice that he resume taking it to ascertain if the headaches were only a transient side effect.  (D.E. 5-12, Page 19).  The ALJ noted Plaintiff reported on March 27, 2009, that he never resumed taking Lexapro.  (D.E. 5-12, Page 19).  The ALJ also reviewed Plaintiff's GAF scores of 60, 50, and 62, the range of which indicates mild to moderate to serious symptoms.  The ALJ noted treating records indicating Plaintiff was diagnosed with alcohol dependence and adjustment disorder with depressed mood and that Plaintiff's overall level of concentration was noted as fair to good with a fair prognosis and that Plaintiff was encouraged to engage in individual therapy and abstain from alcohol.  (D.E. 5-12, Pages 16 and 19).

In sum, the ALJ thoroughly reviews Plaintiff's treatment records and the medical information provided by Plaintiff's treating physicians is consistent with the conclusions of the consultative medical experts and the ALJ's reliance on the testimony of the consultative medical experts is consistent with the regulations.

### 2.  Plaintiff's subjective complaints and credibility

It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference.  *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001).  Subjective complaints must be corroborated, at least in part, by objective medical findings.  *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988)(citations omitted); *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985).  For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment."  *Chambliss*, 269 F.3d at 522.  An ALJ may discount subjective

complaints of pain as inconsistent with other evidence in the record. *Dunbar v. Barnahrt*, 330 F.3d 670, 672 (5th Cir. 2003)(*citing Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991).

The ALJ properly cited, *inter alia*, Social Security Ruling 96-7P[5] and the two part test for evaluating Plaintiff's credibility.  (D.E. 5-12, Page 17).   The ALJ then summarized Plaintiff's hearing testimony and subjective complaints of pain and determined that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged systems, Plaintiff's allegations regarding the intensity, persistence and limiting effects of these symptoms were not credible. (D.E. 5-12, Page 6). The ALJ also thoroughly analyzed the objective medical records of Plaintiff's treating physicians as well as the opinion of Dr. Briggs and Dr. Rogers.  (D.E. 5-12, Page 17-18). The ALJ concluded the pain experienced by the Plaintiff was limiting, but when compared with the total evidence, not severe enough to preclude all types of work given the medical evidence in the record.  (D.E. 5-12, Page 17).   Additionally, contrary to Plaintiff's assertions, the ALJ recognized that Plaintiff could perform some activities of daily living but, at times, needed assistance.  (D.E. 5-12, Page 16).   The ALJ also considered that, due to Plaintiff's sporadic work record, it appeared his unemployment

---

[5] SSR 96-7P states that an ALJ must first consider whether there is an underlying medically determinable impairment that could reasonably be expected to produce the individual's pain or other symptoms.  The ALJ must then evaluate the intensity, persistence, and limiting effects of the individual's abilities to do basic work activities.  If the individual's statements are not substantiated by objective medical evidence, the ALJ determines credibility considering the record as a whole.  Statements about symptoms and pain are not rejected solely due to lack of evidence and other factors, such as activities of daily living, medication dosage and side effects, and treatment and methods of alleviating pain should be considered.  Lastly, the ALJ's credibility determination must be grounded in evidence and must be specifically articulated in the determination.

might not be due to his impairments, further limiting his credibility.  (D.E. 5-12, Page 17).

Additionally, the ALJ noted Plaintiff's medical records show Plaintiff's pain was treated with medication.  Plaintiff's records indicated mild impairments prior to October 27, 2009 and in December 2007, Plaintiff reported having good results with Flexeril and took Lortab when the pain was worse.  (D.E. 5-10, Page 7 and D.E. 5-12, Page 18).  On February 28, 2008, Plaintiff reported that his medications were helpful and his mobility would be much more severely limited without them.  (D.E. 5-11, Page 5).  Plaintiff further reported his pain on a scale of one to ten was a 10 without medication and a four or a five with medication.  (D.E. 5-11, Page 6).  Additionally, in March 2007, contrary to his physician's advice, Plaintiff indicated he would not go to physical therapy because he found it useless.  (D.E. 5-10, Pages 18 and 22); *Johnson v. Sullivan*, 894 F.2d 683, 685 n. 4 (5th Cir. 1988)(a person who fails to follow prescribed treatment will not be found disabled); 20 C.F.R. § 404.1530.

The undersigned does not doubt Plaintiff suffered from pain during the time at issue; however, the record does not support a finding that Plaintiff's pain was constant, unremitting, and wholly unresponsive to therapeutic treatment during the time period currently at issue.  *Chambliss*, 269 F.3d at 522.  The ALJ articulated reasons for rejecting Plaintiff's alleged onset date and gave a convincing rationale for making this determination.  The ALJ did not find that Plaintiff did not have pain.  Rather, he found that the degree of impairment evidenced by the objective medical findings did not comport with the functional restrictions reported by the Plaintiff.  While pain alone can

be disabling, the existence of pain is not an automatic ground for entitled to disability benefits.  *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983).  For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment."  *Chambliss*, 269 F.3d at 522.  Even though the medical evidence and Plaintiff's testimony illustrate that Plaintiff suffered from several impairments during the period at issue, substantial evidence supports the ALJ's conclusion that his impairments did not become sufficiently severe as to prevent him from working during the time at issue.  *Spellman*, 1 F.3d at 361.

### 3.  Developing the case

Plaintiff asserts the ALJ failed to properly reconcile inconsistencies in the record, again suggesting the medical evidence regarding his ability to work with his hip problem was conflicted and weighted toward a finding of disability.  (D.E. 11, Pages 7-11 and 17-20).  Plaintiff insists the ALJ had a duty to resolve these conflicts by further developing the record.

An ALJ owes "a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits."  *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)(citations omitted).  If he fails to do so, the decision cannot be regarded as substantially justified.  *Id*.  Although Plaintiff recites various specific phrases that appear in medical reports and in Plaintiff's testimony, the ALJ does not have a duty to provide an exhaustive list of all doctors' notes and testimony.  Rather, the ALJ must "develop the facts fully and fairly relating to" Plaintiff's application.  *Ripley*, 67 F.3d at 557.  The ALJ satisfied this duty by thoroughly reviewing the objective medical records and Plaintiff subjective complaints

and consulting a medical advisor, a psychologist, and a VE prior to making a determination. *Spellman,* 1 F.3d at 361.

## RECOMMENDATION

It is respectfully recommended that the ALJ's determination that Plaintiff was not disabled from June 26, 2007, through May 13, 2009, is supported by substantial evidence. Therefore, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be **DENIED**, the Commissioner's determination that Plaintiff was not disabled prior to May 14, 2009, be **AFFIRMED**, and Plaintiff's cause of action be **DISMISSED**.

Respectfully submitted this 23rd day of September, 2014.

Jason B. Libby
United States Magistrate Judge

NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(c); Rule 72(b) of the Federal Rules of Civil Procedure; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a Magistrate Judge's report and recommendation within **FOURTEEN (14) DAYS** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).